IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 3 0 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| THELMA OLIVAREZ | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-04-063 |
| | § | (636-c) |
| TIME WARNER CABLE, INC. | § | |
| AND BOB CHERRY | § | |
| Defendant | § | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Comes now, Plaintiff Thelma Olivarez, and files this her response to Defendants' Motion for Partial Summary Judgment and in support would show the Court as follows:

### INTRODUCTION

1.   Plaintiff Thelma Olivarez was physically and verbally assaulted by her former supervisor, Defendant Bob Cherry.  Shortly after the incident, Ms. Olivarez filed a police complaint, reported the incident to the Company's Human Resource Department and hired an attorney to protect her rights.

2.   After Plaintiff reported the incident her work environment changed dramatically.  Her work responsibilities were taken away, her co-workers were cautioned to avoid her, and the company hired an individual to take over most of her responsibilities.  Ultimately Plaintiff was terminated before the project was completed. Prior to the incident, Ms. Olivarez was consistently told she would be around for the project's duration.

3.   As a result of the treatment detailed above, Plaintiff filed a complaint of discrimination with the EEOC/TCHR.  After plaintiff received her "right to sue" from the Texas Commission on Human Rights she filed a lawsuit.

4.   On September 15, 2004, Defendants filed a Motion for Partial Summary Judgment.  It is to this motion that Plaintiff now responds.

## FACTUAL ALLEGATIONS

5. Plaintiff Thelma Olivarez was hired by Defendant Time Warner in October 1999 as an "As-built clerk." (See Attachment "A" Deposition Testimony of Thelma Olivarez, p. 10). The job was temporary and expected to last approximately 2 years. In reality, the job lasted 4. (Attachment "A" p. 14).

6. Plaintiff was a good employee. During her tenure with the company she was promoted to As-built coordinator and finally to as-built supervisor. (Attachment "A" pp. 22, 27 and 28).

7. On or about October 22, 2001, Plaintiff's work environment changed dramatically. She was verbally and physically assaulted by her supervisor Bob Cherry who cussed at her and through a chair at her. (Attachment "A" pp. 41 and 47). Ms. Olivarez was so threatened by his actions that she told the company's Human Resources Department she was not coming back to work. (Attachment "A" pp. 56 & 59). She also reported the incident to the La Feria department and did so because she was scared. (Attachment "A" p. 66). Ms. Olivarez also consulted an attorney and had him write a letter to the company requesting a discussion of the incident. (Attachment "B" October 29, 2003 letter from attorney Jesus Contreras).

8. As stated, Plaintiff was afraid to return to work and told the company she was not coming back. Despite her reservations, Plaintiff returned and was immediately retaliated against by defendant Cherry. Specifically, Defendant Cherry undermined her supervisory authority and told her subordinates to report directly to him. (Attachment "A" p. 59). Cherry also began to document her tardies and unilaterally altered her evaluation downward after she had signed another version. (Attachment "A" pp. 69 and 93). In addition, Cherry began to give her disinformation which effected her ability to do her job. (Attachment "A" p. 65). On another occasion, Cherry brought up the assault and alluded Plaintiff should drop the charges. The pressure was so intense, Cherry made her cry and feel as if she was being pressured to quit. (Attachment "A" p. 68 & 71).

9. Ms. Olivarez also felt the company was directly retaliating against her. For example, the company glossed over the incident and falsely stated she did not feel Cherry was trying to physically hurt her. (Attachment "A" p. 66). The company also hired another individual to do her job. (Attachment "A" pp. 78 and 79). After he came on board she was terminated and not given the opportunity to transfer as past supervisors. (Attachment "A" pp. 81, 84 and 85). Finally and most significantly she was let go while Defendant Cherry was not disciplined and allowed to keep his job. (Attachment "A" p. 111).

## ARGUMENTS AND AUTHORITIES

Hostile Work Environment

10.   A sexually hostile work environment exists when unwelcome sexual advances, requests for sexual favors, sexually abusive or vulgar language, **or** other verbal, visual, **or** physical conduct unreasonably interfere with an individual's work performance or create an intimidating, hostile, or offensive work environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66-67 (1986).  A hostile environment claim may be made based upon remarks, innuendo, physical acts, or other job conditions. *Id.* at 65.

11.   In the instant case Plaintiff Thelma Olivarez was physically and verbally assaulted by her supervisor.  The assault was so severe she left the company in tears. She also advised the Company's H. R. Department that she felt so bad she did not feel like returning to work. (Attachment "A" pp. 51 & 59).  Plaintiff ultimately returned to work but her supervisory authority was undermined.  Moreover, Defendant Cherry confronted her about the incident and pressured her to drop the assault charges. His actions were so intolerable they made her cry and she felt [he was] "making my life and my job unbearable."  (Attachment "A" pp. 68, 70 & 71).  Arguably the actions of Defendant Cherry  so unreasonably interfered with Ms. Olivarez ability to do her work that it created a Hostile Work Environment.

12.   Despite this evidence, the Defendants argue they are entitled to Summary Judgment because Cherry's actions were not discriminatory.  In support of this position they rely on a statement given to the EEOC by Ms. Olivarez.  (Defendant's Motion for Summary Judgment p. 3).  The statement was in response to a question posed by the EEOC regarding Mr. Cherry's intent when he assaulted her.  Ms. Olivarez responded candidly she was unsure of his intent.  The defendant's intent, however, is irrelevant. The issue is how the harassment is perceived.  To that effect, The United States Supreme Court held the issue of whether an abusive work environment exists can be determined only by examining the "totality of the circumstances," including a) the frequency of the discriminatory conduct, b) its severity, c) whether the conduct was physically threatening or humiliating or merely offensive, and d) whether it reasonably interfered with the employees work performance. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17 (1993).  The court concluded the central issue is whether a reasonable person would have found the conduct complained of severe and pervasive enough to create an objectively hostile or abusive work environment. *Id.* at 21-22.  In short the issue regarding Cherry's conduct is for a jury to decide and Summary Judgment on this issue should be denied accordingly.

Title VII/TCHR Retaliation

13.   Both Title VII and the TCHRA prohibit retaliation against an employee complaining of discrimination or harassment based on sex or other grounds.  42 U.S.C. §2000e(a); Tex. Lab. Code Ann. §21.055.

14.   A sex discrimination claim can proceed on a retaliation theory where the claimant alleges she suffered an adverse employment action because she filed a charge of discrimination, participated in a discrimination investigation or otherwise opposed sex discrimination by the employer. *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 985 (10th Cir. 1996).  Moreover a claim of a sexually hostile working environment can rejected, but allow a plaintiff to proceed on retaliation calm and assert that the employer retaliated against her for "protesting" what she believed to be a sexually hostile environment.  *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 705 (5th Cir. 1997)

15.   In the instant case, there is ample evidence plaintiff was retaliated against after filing her claim of sexually hostile work environment.  As stated, shortly after she reported her claim, the company hired someone to take over her duties and fired her without affording any lead time to look for other jobs within the company as was its practice and procedure. (Attachment "A" pp. 78, 79 & 81).  Moreover, plaintiff had attempted to transfer prior to her termination but was denied that opportunity and told she had a job for as long as the project existed.  The job did not end until late 2003. (Attachment "A" pp. 14).

16.  For the reasons stated above, plaintiff would aver that a fact issue exists on the issue of sexual harassment and retaliation and would pray the court deny Defendants' Partial Motion for Summary Judgment accordingly.

Respectfully submitted,
LAW OFFICE OF MIGUEL SALINAS

By
MIGUEL SALINAS
Attorney in charge
FEDERAL I.D. NO. 15171
STATE BAR NO. 17534750
803 Old Port Isabel Road
Brownsville, Texas 78521
956/550-1115 Telephone
956/550-1134 Telefax

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the true and foregoing copy of the Plaintiff's Response to Defendants' Partial Motion for Summary Judgment was sent to the Defendant via fax and regular mail on this the 30th day of September , 2004 to:

Hon. Micael Ezell
312 E. Van Buren
P.O. Box 2878
Harlingen, TX 78551
956/421-4258 (facsimilie)

ATTORNEY FOR DEFENDANTS TIME WARNER CABLE, INC., AND BOB CHERRY

MIGUEL SALINAS

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTSRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| THELMA OLIVAREZ | ) ( | |
|     Plaintiff | ) ( | |
| | ) ( | |
| VS. | ) ( | C.A. NO. B04-063 |
| | ) ( |    (636-c) |
| TIME WARNER CABLE, INC. | ) ( | |
| AND BOB CHERRY | ) ( | |
|     Defendant | ) ( | |

---

ORAL DEPOSITION OF
THELMA OLIVAREZ
AUGUST 27, 2004

---

ORAL DEPOSITION OF THELMA OLIVAREZ, produced as

a witness at the instance of the DEFENDANTS, taken in

the above-styled and numbered cause on AUGUST 27, 2004,

reported by PEGGY BRYANT, Certified Court Reporter

No. 1208, in and for the State of Texas, at the offices

of Miguel Salinas, 803 Old Port Isabel Road,

Brownsville, Texas, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record

or attached therein.

ORIGINAL

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

10:17   1       Q.   Yes, ma'am, if you remember.

10:17   2       A.   I believe the date was like 14th, 16th,

10:17   3   something like that.  I'm not real sure, but it was a

10:17   4   week to two later.

10:17   5       Q.   Okay, so probably in October of '99?

10:17   6       A.   Yes, sir, it was October of '99.

10:17   7       Q.   Okay.  And you applied for any available

10:17   8   position, I believe?

10:17   9       A.   Correct.

10:17  10       Q.   Who did you talk to in the interview process?

10:17  11       A.   Gary Lee.  He was project supervisor at the

10:17  12   time and John Tijerina.  He was the technical

10:17  13   supervisor at the time.

10:17  14       Q.   And they're the ones that you interviewed with?

10:17  15       A.   Yes.  I also interviewed initially with them,

10:18  16   and I also had a second interview with Louie Lara.  He

10:18  17   was the construction supervisor.

10:18  18       Q.   And Gary Lee, was he replaced by Bob Cherry?

10:18  19       A.   Yes.

10:18  20       Q.   So he was Cherry's predecessor?

10:18  21       A.   Yes.

10:18  22       Q.   And what job did they talk about you doing when

10:18  23   you applied with them?

10:18  24       A.   As-built clerk.

10:18  25       Q.   The job that you eventually received?

10:22  1      Q.    Excuse me, the clerk?

10:22  2      A.    Right.

10:22  3      Q.    Is that the job description that was your job

10:22  4    description when you went to work there?

10:22  5      A.    Yes, sir.

10:22  6      Q.    Does that job description accurately reflect

10:22  7    what you did?

10:22  8      A.    Yes.

10:22  9      Q.    You went into the construction division of Time

10:22 10    Warner.    What did you understand the construction

10:22 11    division was going to do and how long they were going

10:22 12    to do it?

10:23 13      A.    When I talked -- you mean during the

10:23 14    application or at any time?

10:23 15      Q.    Well, let's just take the application time.

10:23 16    Did they tell you how long the projects would go on,

10:23 17    for instance?

10:23 18      A.    Yes.    They said it was an upgrade and that it

10:23 19    would end in two years.

10:23 20      Q.    And how long did it take for it to end?

10:23 21      A.    It just ended a few months ago, and I applied

10:23 22    in '99, so four years, four years and a half, something

10:23 23    like that.

10:23 24      Q.    So the project they had planned to do in two

10:23 25    years they did in four, four and a half, more or less?

10:33 1      Q.   At any time, yeah.

10:33 2      A.   When I was a clerk, I hadn't thought of moving,

10:33 3  no.  It wasn't until I became a supervisor that I

10:33 4  thought that I would want to follow them wherever they

10:33 5  went.

10:33 6      Q.   And when did you become an as-built supervisor?

10:33 7      A.   As-built supervisor?  In 2000 -- no, I'm

10:33 8  thinking it was 2001.

10:33 9      Q.   And what was the difference in your job at that

10:33 10  time?

10:33 11      A.   As an as-built supervisor, I had clerks that

10:33 12  were doing the general work.  I took care of most of

10:33 13  the contractors, you know, the -- they did the lines

10:33 14  and all that.  I made sure that everything that was

10:33 15  supposed to be transferred was transferred.  I

10:33 16  supervised them.  I supervised production.  I

10:34 17  supervised the contractors.  At one time when I was the

10:34 18  as-built supervisor, we had up to eight contractors, so

10:34 19  I made sure all their information was turned in and

10:34 20  paid -- or entered into the computer to be paid.

10:34 21      Q.   So when you say you supervised the contractors,

10:34 22  you didn't go in the field and supervise them.  You

10:34 23  looked at the work that was brought in on paper?

10:34 24      A.   I went out in the field at times.

10:34 25      Q.   What did you do when you went out in the field?

10:40 1    they went out in the field, whatever trucks, tools they

10:40 2    needed, made sure that they had that.  Throughout the

10:40 3    day, kept in contact with them.  If I needed to go out

10:40 4    with them, I did.  If they needed me out there to do

10:40 5    something or an accident, whatever the case may be, I

10:40 6    was out there.  When they came back at the end of the

10:40 7    day, they would provide the map to me.  I made sure

10:40 8    that whatever had to be done was done.  I was still

10:40 9    responsible for production, so I had to make sure that

10:40 10   they turned in all their footages, everything that was

10:41 11   considered charge -- you know, to be charged.  Just

10:41 12   every day, everything that had to deal with that job

10:41 13   for the crews.

10:41 14       Q.  And I assume you were given what the tasks

10:41 15   were; that is, you didn't create what the tasks were?

10:41 16       A.  Right, right.  That was always -- that's always

10:41 17   been that way.

10:41 18       Q.  Who were your supervisors under these three

10:41 19   positions that you had at Time Warner?

10:41 20       A.  When I was a clerk, when I started, it was

10:41 21   Louie Lara.  After he left, it was Diane White.  Oh, I

10:41 22   did miss -- I did miss a step there because before --

10:41 23   after as-built clerk, then I was an as-built

10:41 24   coordinator, and that's when I did a lot of the QC,

10:42 25   when I was a coordinator.  I was just thinking, "Wait a

10:42 1    minute, that didn't make sense." But I was an as-built

10:42 2    coordinator, and that was Diane White as well. And

10:42 3    then after I became supervisor, it was Bob Cherry. He

10:42 4    was in charge of all the supervisors.

10:42 5        Q.  As-built clerk, as-built coordinator?

10:42 6        A.  As-built supervisor and then supervisor.

10:42 7        Q.  The coordinator came after clerk?

10:42 8        A.  Right.

10:42 9        Q.  And supervisor came after coordinator?

10:42 10       A.  Right.

10:42 11       Q.  As a coordinator, did you have people working

10:42 12   directly for you?

10:42 13       A.  No, indirectly. I didn't do their evaluations

10:42 14   or anything like that, but they still kind of reported

10:42 15   to me and -- on what they needed to do and things like

10:42 16   that.

10:43 17       Q.  And we got down to Diane White being your

10:43 18   supervisor. She -- did she remain that until you

10:43 19   became a supervisor or what?

10:43 20       A.  As-built supervisor, it was Bob Cherry. And

10:43 21   then supervisor, Bob Cherry.

10:43 22       Q.  Generally, how was your relationship with Bob

10:43 23   Cherry before October 2002?

10:43 24       A.  It was all right. We discussed situations and

10:44 25   wouldn't always see eye to eye, but there wasn't

| | |
|---|---|
| 11:09 1 | totals on what we call the placement log, and what it |
| 11:09 2 | was was a log of all jobs issued to contractors.  He |
| 11:09 3 | wanted me to get totals for a specific contractor that |
| 11:09 4 | he was having a hard time with and was trying to get |
| 11:09 5 | fired. |
| 11:09 6 | He had expressed that to his supervisor, |
| 11:09 7 | Jim Davis, and Bob needed -- needed backup.  He needed |
| 11:09 8 | the totals to justify to Jim Davis why he was going to |
| 11:09 9 | get rid of this contractor.  When the totals didn't add |
| 11:09 10 | up to what he wanted them to, or had expressed to Jim |
| 11:09 11 | of how bad this contractor was doing, he came |
| 11:09 12 | upstairs -- because he had called and asked me to get |
| 11:09 13 | those totals for him. |
| 11:09 14 | Those totals didn't add to what he wanted |
| 11:10 15 | them to be, I guess, and, anyway, he came upstairs and |
| 11:10 16 | started looking at my computer at the placement log, |
| 11:10 17 | and he started criticizing it, just saying, "Why are |
| 11:10 18 | you doing it this way and why did you do that," and you |
| 11:10 19 | know, this sort of thing. |
| 11:10 20 | I told him, "We have been doing this -- I |
| 11:10 21 | have been updating you with this log for three years. |
| 11:10 22 | Now it's wrong?"  He then got up, got upset, started |
| 11:10 23 | saying, "F this shit," and all this and grabbed the |
| 11:10 24 | chair and threw it at the wall.  I was there -- |
| 11:10 25 | standing there.  He threw it -- I guess only Bob will |

11:17 1      A.   Right, I went this way.

11:17 2      Q.   So he stood up from the chair, stood behind it?

11:18 3      A.   Yes.

11:18 4      Q.   Was he looking at you at that time?

11:18 5      A.   Yes, uh-huh, because he was cussing at me.

11:18 6      Q.   So he was talking to you at the same time?

11:18 7      A.   Yes.

11:18 8      Q.   And took the chair and threw it into the wall,

11:18 9  you think, above the grate?

11:18 10     A.   Right.

11:18 11     Q.   And then he walked out?

11:18 12     A.   Right.

11:18 13     Q.   Can you show us on your Exhibit 14 the door he

11:18 14  exited through?

11:18 15     A.   Yes, there's the door.

11:18 16     Q.   So he then walked away from you and out the

11:18 17  door?

11:18 18     A.   Uh-huh.

11:18 19     Q.   And three people you have identified on Exhibit

11:18 20  14 saw the whole thing?

11:18 21     A.   Yes.

11:18 22     Q.   Do you know where those people are these days?

11:18 23  Say Diane Richards to start with.

11:18 24     A.   Diana Richards, last word I had, works at

11:18 25  Valley Baptist Medical in Harlingen.

11:30 1    room?

11:30 2        A.   I believe so.   I know they talked to Ruben.

11:30 3        Q.   And did you do or sign a written statement at

11:30 4    the police department?

11:30 5        A.   Yes.

11:30 6        Q.   I'm going to hand you what's marked as Exhibit

11:30 7    17.   I'll ask you if that's it.

11:30 8        A.   Yes, sir.

11:30 9        Q.   Exhibit 17 doesn't appear to be signed, but is

11:30 10   that --

11:30 11       A.   This is my statement, yes.

11:30 12       Q.   This is what you told them?

11:30 13       A.   Right.

11:31 14       Q.   And you told them that Bob threw a chair and

11:31 15   struck the wall by your desk and so you felt threatened

11:31 16   by his actions?

11:31 17       A.   Yes, of course.

11:31 18       Q.   You felt threatened by the chair thing?

11:31 19       A.   By his whole action.   He was very upset.

11:31 20       Q.   Did Bob ever physically move in your direction?

11:31 21       A.   Other than turning around to throw the chair,

11:31 22   no, sir.

11:31 23       Q.   He basically stayed at the computer desk, sent

11:32 24   the chair to the wall and turned around and went the

11:32 25   other way?

11:35 1   late afternoon, and I told her that I possibly wouldn't

11:35 2   be coming back.  And at that time she said, "Well, you

11:35 3   know, my suggestion to you is to take a few days,"

11:35 4   which the doctor had already recommended.  And I told

11:35 5   her that -- "take a few days, think about it before you

11:35 6   actually make a decision."  So that's what I did.  And

11:35 7   I came back -- I believe it was a Wednesday or

11:35 8   something like that, so I took the rest of the week and

11:35 9   came back Monday.

11:35 10       Q.   Were you paid for those days off?

11:36 11       A.   I believe we have sick days since I had had a

11:36 12   doctor's excuse.

11:36 13       Q.   And when you went back Wednesday, was it

11:36 14   business as usual or --

11:36 15       A.   No, sir.

11:36 16       Q.   Did you do the same work at least?

11:36 17       A.   I did the same -- I was trying to do the same

11:36 18   work.  The foremen, crew foremen, expressed to me that

11:36 19   Bob Cherry had told them that they were not to come to

11:36 20   me with their production or they were not going to be

11:36 21   receiving work from me, that they would be going

11:36 22   directly through him.  So he was already undermining my

11:36 23   authority with the foremen, which I was used to dealing

11:36 24   with them on a daily basis.

11:36 25       Q.   You were a dispatcher at this time?

11:47  1   Sapio with regard to this matter?

11:47  2       A.   Right.

11:47  3       Q.   Did you tell Ms. Sapio that you didn't believe

11:47  4   Mr. Cherry had intended to bring any physical harm to

11:47  5   you?

11:47  6       A.   I don't believe so.  I was -- I was afraid.  I

11:47  7   was afraid and that's why I went to the police.

11:47  8       Q.   Did you tell her you had had heated discussions

11:47  9   in the past and you always worked through them?

11:47 10       A.   I don't know if I said heated discussions but

11:47 11   as far as -- and I think I expressed that to you as

11:48 12   well, that we did have our -- you know, we didn't see

11:48 13   eye to eye, but it was never any threat of physical

11:48 14   harm when we discussed things, you know.  This time

11:48 15   there actually was.

11:48 16       Q.   And so you did not tell Ms. Sapio that you

11:48 17   believed that Mr. Cherry did not have intent to bring

11:48 18   physical harm to you?

11:48 19       A.   I'm not sure what he was capable of doing, sir.

11:48 20   I mean, at that point he was very upset.

11:48 21       Q.   But, again, with respect to what you told Ms.

11:48 22   Sapio --

11:48 23       A.   I don't believe I said that.

11:48 24       Q.   So her recollection is different from what you

11:48 25   told her and from what she has put here?

11:53  1    about dismissing the complaint.  What can we do to

11:53  2    dismiss this, to, you know, get over it.  I believe

11:53  3    that he used that word, too.

11:53  4              And I said, "Well, you know, this is

11:54  5    something that you created, that you," you know -- so

11:54  6    then he grabbed the policy book, put it on his desk and

11:54  7    did this with his hand and said, "Well, you know, if

11:54  8    this isn't going to go away, I guess we are going to

11:54  9    have to go by the book," meaning he was going to start

11:54 10    writing me up, go by policy, go by regulation, which he

11:54 11    did because never in the whole time prior to my -- to

11:54 12    the incident did he ever say anything to anybody about

11:54 13    being tardy.  Then all of a sudden on his calendar he

11:54 14    started documenting my tardies.

11:54 15        Q.   Were you ever written up for tardies?

11:54 16        A.   No, but he did document it on my last

11:54 17    evaluation.  After I signed it, he added those comments

11:54 18    to the evaluation.

11:54 19        Q.   And what month was that?

11:54 20        A.   In December 2002.

11:54 21        Q.   Had you been tardy regularly during your

11:55 22    employment?

11:55 23        A.   I was tardy, but I wouldn't say every day or --

11:55 24    you know, what you would consider regularly.  I'm not

11:55 25    sure but, you know, everybody did -- I am not excusing

13:45 1    performance dates are January 2nd to June 2nd.  That's

13:45 2    Exhibit 25.

13:45 3        Q.  Of which year, ma'am?

13:45 4        A.  2002.  And the last one, Exhibit 24, is also

13:45 5    job title, supervisor, July 2002 through December 2002,

13:46 6    which I -- this was two weeks prior to my dismissal or

13:46 7    to my -- actually, it's -- and on this one, this is the

13:46 8    one I received a copy, and -- or I saw the evaluation

13:46 9    did not contain the comments.  He added those after.

13:46 10            I received these copies from Denver for my

13:46 11   personal file, and he had added the evaluator comments

13:46 12   after I signed the original.

13:46 13       Q.  Do you have a copy with the evaluator comments

13:46 14   on it?

13:46 15       A.  This is -- is that 2002?

13:46 16       Q.  Exhibit 24.

13:46 17       A.  Present was business manager, Jody -- her name

13:47 18   changed.  She got married.  It was Jody Thompson.  She

13:47 19   was present when this evaluation was presented to me.

13:47 20       Q.  Now, there are also employee comments.  Did you

13:47 21   make those?

13:47 22       A.  Those are mine.  Those are comments I put in.

13:47 23   When we -- when he would give an evaluation, he would

13:47 24   give me a blank one.  I would write up what I thought I

13:47 25   deserved and he would write up what he did.  But if

11:45  1    remainder of your job other than the dispatch

11:45  2    functions?

11:45  3        A.  I was back to doing as-built and production.

11:45  4    Any time that I would try to do the rest of my duties

11:45  5    as a supervisor for the crews, it was -- I was met with

11:45  6    some resistance there by either him not giving me total

11:45  7    information or, you know, just pretty much not wanting

11:46  8    me there.  I mean, it was obvious in his demeanor.

11:46  9        Q.  Did you talk to Kathy Sapio more than once?

11:46 10        A.  Yes, sir.

11:46 11        Q.  The first time on the day of the incident?

11:46 12        A.  Yes, sir.

11:46 13        Q.  So I guess you knew who she was?

11:46 14        A.  Yes, sir.

11:46 15        Q.  And what's her position?

11:46 16        A.  Human resource manager, I believe, is her

11:46 17    title.

11:46 18        Q.  Where is she located?

11:46 19        A.  At the time she was in Denver, Colorado, main

11:46 20    office for Time Warner Construction Division.

11:47 21        Q.  Let me hand you what has been marked as Exhibit

11:47 22    11.  I'll ask you if you are familiar with that

11:47 23    document.

11:47 24        A.  Yes.

11:47 25        Q.  Is that a letter that you received from Kathy

11:51  1    believe that retaliation took?

11:51  2        A.   First of all, as I have already explained or

11:51  3    expressed, that he was undermining my authority, which

11:52  4    in the past he had always told these guys, "She is the

11:52  5    supervisor.  You will report to her."  Basically pretty

11:52  6    much cramming me down their throat, and then all of a

11:52  7    sudden it was, "No, don't go to her.  She is -- you

11:52  8    know, you don't need to go to her anymore.  You need to

11:52  9    come to me."

11:52 10            There was a point in time after the

11:52 11    incident he called me into his office and said, "How

11:52 12    are we going to -- what are we going to do to let go of

11:52 13    this or dismiss this?"  And I said, "Well, you know,

11:52 14    I'm not sure."  He grabbed a policy book and said,

11:52 15    "Well, then I guess, in other words, if we are not

11:52 16    going to let it go, then I guess I'm going to have to

11:52 17    go by the book," which meant now he was going to adhere

11:52 18    to policy, in my case, is what he was referring to.

11:53 19            Adam Hermansen was present.  There were

11:53 20    several incidents to that effect where he was just, in

11:53 21    my opinion, wanting me to quit because he was making my

11:53 22    life and my job unbearable at some point, but I just --

11:53 23        Q.   Can you be more specific about what he said?

11:53 24    "Can we dismiss this" or what did he say?

11:53 25        A.   The complaint, the complaint.  He was talking

11:57  1    would have been November.

11:57  2        Q.  Did you ever have any other discussions -- or

11:57  3    just tell us, if you would, any discussions that you

11:57  4    had with Mr. Cherry about the incident of October 9th

11:57  5    after it occurred.

11:57  6        A.  Yes, sir.

11:57  7        Q.  What were those conversations?

11:57  8        A.  I believe it was -- it was me and Adam

11:57  9    Hermansen and Bob Cherry, and we were there to -- I was

11:57 10    discussing with him what my duties were because my

11:57 11    duties had changed, as I was telling him, and I was

11:57 12    discussing with him was I still a supervisor, was I

11:57 13    still directing crews, was I still going to do all the

11:57 14    things that I was doing.  And he said yes, but his

11:58 15    actions weren't what he was saying.

11:58 16             And then the conversation turned toward

11:58 17    the incident, I believe, where he expressed that he

11:58 18    didn't know -- that he thought that he had just pushed

11:58 19    the chair.  And I'm like, "Bob, you didn't just push

11:58 20    the chair.  You threw the chair."  And he said he

11:58 21    didn't remember that.  He said -- he was denying

11:58 22    basically the incident, that he had thrown the chair,

11:58 23    and he asked -- I remember getting upset and started to

11:58 24    cry, and nothing else was kind of said.  Everything was

11:58 25    kind of like, "Well, okay, let it go."  We walked off.

12:11  1    regard to the incident in question.

12:11  2        A.  Correct.

12:11  3        Q.  How long do you think this job would have

12:11  4    lasted for you if the incident in question had not

12:11  5    occurred?

12:11  6        A.  Till the end of the project.

12:12  7        Q.  And when did the project end?

12:12  8        A.  Earlier this year, I believe.

12:12  9        Q.  End of 2004?

12:12 10        A.  '4.

12:12 11        Q.  Was there another as-built clerk that took your

12:12 12    place after you left?

12:12 13        A.  There was a clerk there, but he didn't take my

12:12 14    place, no.  Don Dover took my place.

12:12 15        Q.  Don Dover?

12:12 16        A.  Yes, sir.

12:12 17        Q.  Was -- what was Mr. Dover's job?

12:12 18        A.  He was rehired, from what I see here, as

12:12 19    construction supervisor, but he did what I used to do.

12:12 20        Q.  Did he do anything besides what you used to do?

12:12 21        A.  Not that I am aware of.

12:12 22        Q.  Were you ever --

12:12 23        A.  Actually, he did less than I did because I used

12:12 24    to do as-built and production and supervise crews, just

12:13 25    like he did.

12:13 1    Q.  Well, but he was a construction supervisor, you

12:13 2  say?

12:13 3    A.  That's what it says here.

12:13 4    Q.  I mean, let's just talk about what you know

12:13 5  rather than what you read.

12:13 6    A.  That's what I'm saying, I don't know.  That's

12:13 7  just what --

12:13 8    Q.  When did Mr. Dover appear on the scene in

12:13 9  relation to when you left?

12:13 10   A.  November, 2002.

12:13 11   Q.  And you met the gentleman?

12:13 12   A.  I knew him from before.  He used to work for a

12:13 13  contractor.

12:13 14   Q.  And what did you see him doing then after he

12:13 15  was hired?

12:13 16   A.  He was dispatching the crews, which I used to

12:13 17  do.  He used to be -- he was going out in the field,

12:13 18  checking on them, he was bringing in information to me

12:14 19  that the foremen used to bring to me.  That's about it.

12:14 20   Q.  So you don't know of anything that he was doing

12:14 21  that you hadn't done?

12:14 22   A.  I don't know.

12:14 23   Q.  That is, he may have done things that you

12:14 24  hadn't done?

12:14 25   A.  That I am not aware of, yes, sir.  I mean,

12:15  1      Q.   Okay.

12:15  2      A.   I didn't know I was going to be laid off until

12:16  3  that day when he told me I no longer had a job.

12:16  4      Q.   You knew things were downsizing, though, didn't

12:16  5  you?

12:16  6      A.   I knew that they were eventually, but why were

12:16  7  they hiring supervisors if they were downsizing?  That

12:16  8  was my thinking.

12:16  9      Q.   So then as to the position Mr. Dover was hired

12:16 10  for, you hadn't seen it advertised before it was --

12:16 11      A.   No, sir.

12:16 12      Q.   And you didn't apply for it?

12:16 13      A.   Why would I?  That's what I'm saying, because

12:16 14  as far as I knew, I was the supervisor on that project.

12:16 15  When he came in, I knew there was something going on,

12:16 16  but I -- they are not -- downsizing was not one of

12:16 17  them, like I said, if they hired him.

12:16 18      Q.   Weren't there less people around all the time

12:16 19  by late 2002?

12:16 20      A.   They were hiring supervisors, obviously.  They

12:16 21  hired Mr. Dover.

12:16 22      Q.   But --

12:16 23      A.   They were downsizing, yes.

12:16 24      Q.   Did they continue to downsize through 2003?

12:17 25      A.   I was not there.

Q.   That's in 2001?

A.   Yes, sir, and beginning in 2002.

Q.   How many other people went out of the organization say in the last three months of 2002 besides the six of you that were in this group?

A.   As far as I knew, that was it.  I'm not sure what happened at the end of December.  They might have. I'm not sure.  But up until the date when I was terminated, it was just the group that I was with, and I believe it was six.  It may have been five.

Q.   Did you keep up with the downsizing or growth of that construction division after you left it?

A.   Not really.

Q.   I'll call your attention to Exhibit 8.  There is a comment there about a lady from Ohio coming into the construction division.  Can you tell us what you were saying there?

A.   Yes, sir.  As I -- I told you earlier, that I was not asked if I wanted to retrain in any way. Ms. -- Diane -- De Ann, and I can't remember her last name -- she came from Ohio.  She was having disciplinary problems over there, and this I know because I was in a meeting when they were talking about hiring her.

I was not asked if we needed another --

12:23 1    you know, I was in the meeting, but they were making

12:23 2    the decisions, Bob and Jim Davis.  She was not -- she

12:23 3    was brought in as a fiber splicer, but then when the

12:23 4    fiber splicer -- when the fiber splicing slowed down,

12:23 5    they retrained her to sweep -- what they call cable

12:23 6    sweep, which is totally different than what she -- her

12:24 7    scope of work as a fiber splicer.

12:24 8        Q.   When did she come in in relation to when you

12:24 9    had left the company?

12:24 10       A.   She had come in late 2001.

12:24 11       Q.   So she had been there a year by the time you

12:24 12   left?

12:24 13       A.   I believe so, yes, sir.

12:24 14       Q.   Your thinking there is she was found a

12:24 15   different position when she wasn't needed as a splicer?

12:24 16       A.   Yes, sir, that's what happened.

12:24 17       Q.   And how many other people do you know of that

12:24 18   were found different positions when their -- you know,

12:24 19   they were no longer needed?

12:24 20       A.   None.

12:24 21       Q.   So that's the only one you can think of?

12:24 22       A.   Yes, sir.

12:25 23       Q.   Did her performance issues continue after she

12:25 24   came?

12:25 25       A.   Her and Bob were friends.  No, there was no

10:18  1    A.   Yes.

10:18  2    Q.   And what did they say were the qualifications

10:18  3    for that position?

10:18  4    A.   That, I guess -- I don't remember what the

10:18  5    qualifications were.  They needed someone; I needed a

10:18  6    job.  That was basically -- if you could read, write,

10:19  7    read a map.

10:19  8    Q.   So basically read and write, read a map?

10:19  9    A.   That was what the as-built clerk would entail,

10:19 10    is mainly updating maps of where the cable was placed

10:19 11    and things like that.  So at that time that was what

10:19 12    they needed.

10:19 13    Q.   And you started doing that work in late '99?

10:19 14    A.   Yes, sir.

10:19 15    Q.   Was that work you were able to do?  Did it fit

10:19 16    your skills and so on?

10:19 17    A.   It was -- it was a job at that time.  I needed

10:19 18    a job and I could -- it was something that I could do,

10:19 19    yes.

10:19 20    Q.   You figured it out and were able to --

10:19 21    A.   Easily, easily.

10:19 22    Q.   So you had received papers from the field that

10:20 23    would show construction in progress?

10:20 24    A.   Uh-huh.

10:20 25    Q.   And what would you do with them?

11:23  1          Q.   CMI was one of the construction contractors?

11:23  2          A.   Correct.

11:23  3          Q.   Do you know where he is these days?

11:23  4          A.   No, sir.

11:23  5          Q.   Was anybody else in the area that would have

11:23  6   heard or seen some of this incident?

11:23  7          A.   I'm not sure.  The warehouse was right below

11:23  8   because this was upstairs, and there was offices right

11:23  9   beneath us, so they may have heard something, but I'm

11:23 10   not sure.  That's the Time Warner communications people

11:23 11   right beneath us so they might have heard something.

11:23 12          Q.   So when you walk out the door, showing on your

11:23 13   Exhibit 14, do you go to a stairwell or what's out

11:23 14   there?

11:23 15          A.   Stairs down.

11:23 16          Q.   So this footprint on Exhibit 14 basically takes

11:24 17   up the second floor?

11:24 18          A.   Yes.

11:24 19          Q.   What did you do after the incident and after

11:24 20   Mr. Cherry walked out?

11:24 21          A.   I cried.  I was upset.  He left, and a few

11:24 22   minutes later Adam Hermansen walked in the room.  He

11:24 23   was the project administrator, which is human

11:24 24   resources.  He asked me what happened, and I couldn't

11:24 25   talk to him.  Diane and Ruben were trying to explain to

11:55 1  it.  I'm just saying that was common for everybody.

11:55 2      Q.  Now, in that conversation that you have just

11:55 3  described with Mr. Cherry, was he trying to make amends

11:55 4  with you or was he trying to get you to drop a --

11:55 5      A.  He was trying to get me to drop the complaint.

11:55 6      Q.  The criminal complaint or office complaint?

11:55 7      A.  At that point, I'm not sure.  We hadn't filed

11:55 8  this.  I had seen the lawyer, Mr. Contreras, at that

11:55 9  time and he was dealing with whatever process he had to

11:56 10  deal with, so the complaint may be what -- him saying,

11:56 11  "Yes, we are seeking" -- you know, that I was seeking

11:56 12  legal advice so --

11:56 13      Q.  You told him you were seeking legal advice?

11:56 14      A.  Right, I told Kathy I was.

11:56 15      Q.  Before this discussion with Cherry?

11:56 16      A.  I'm sure Mr. Cherry knew through Kathy Sapio

11:56 17  because I wasn't friendly where I would say, "Oh, by

11:56 18  the way, I went to see a lawyer," you know.

11:56 19      Q.  And this meeting with Bob where he got out the

11:56 20  policy book, how long did that happen after the October

11:56 21  9th incident?

11:56 22      A.  This had to be a few weeks.  The incident --

11:56 23  yeah, it had to be probably beginning of November

11:57 24  maybe, or I'm trying to think because I think in terms

11:57 25  of incidents that happened throughout.  I'm thinking it

Law Offices
of
# JESUS CONTRERAS
*Attorney at Law*

---

October 29, 2002

By CMRRR 7002 0460 0000 6466 2812 and Regular Mail

Time Warner Cable
ATTN: Kathy Sapio
160 Inverness Drive
Englewood, CO 80112

RE:    My Client: Thelma Olivarez

Dear Ms. Sapio:

This correspondence is to inform you that I represent Ms. Olivarez in regards to an incident that occurred on October 10, 2002 at Time Warner Cable, 301 E. Expressway 83, La Feria, Texas 78559. My client is an employee at this particular center and was involved in an altercation with her immediate supervisor, Bob Cherry. Mr. Cherry became both vulgar and mentally aggressive towards my client in front of three other employees. Mr. Cherry was apparently aggravated by the manner in which certain procedures were done and began using fowl language and proceeded to throw a chair against the wall.

 Please contact my office immediately to discuss this matter in detail. I appreciate your time and attention.

Sincerely,

JESUS CONTRERAS
Attorney at Law

JC/cp



Olivarez
EXHIBIT NO. 18
8-27-04
Peggy Bryant

---

315 W. Business 83
Weslaco, Tx 78596

Phone: 956-565-5915
956-973-9897
Fax: 956-973-9828